**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION**

| | |
|---|---|
| **DALE GRAY**, | ] |
| Plaintiff(s), | ] |
| vs. | ] CV-95-N-3092-W |
| **THE UNIVERSITY OF ALABAMA,** et al., | ] |
| Defendant(s). | ] |

### Findings of Facts and Conclusions of Law

**I.  Introduction.**

In this discrimination action, the plaintiff, Dale Gray ("Ms. Gray"), originally brought claims against the University of Alabama through its Board of Trustees (the "University"), various deans and professors, and Dr. Alice Parker in her official and individual capacities ("Dr. Parker") pursuant to Title IX of the Civil Rights Act of 1972, 20 U.S.C. § 1681 ("Title IX"), Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"), Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.* (the "ADA"), and Alabama contract and tort law. Specifically, the plaintiff's complaint contends that on the basis of her sex and her handicap, the defendants excluded her from participation in, denied her the benefits of, and subjected her to discrimination under its academic programs; limited her enjoyment of rights, privileges, advantages, and opportunities enjoyed by other University students; breached the contract between her and the University to provide an academic environment free from sexual harassment and discrimination; and acted negligently and outrageously. *Complaint* at 7-11 (unnumbered pages).

In an order entered on March 13, 1996, the court dismissed the Title IX and Section 504 claims brought against Dr. Parker in her individual capacity, dismissed the ADA claims against Dr. Parker in both her individual and official capacities, and dismissed Dr. Parker as a defendant in her official capacity. In a second order entered on March 13, 1996, the court dismissed the University of Alabama as a named defendant and replaced it with the Board of Trustees of the University of Alabama, dismissed all defendants named in their official capacities, and dismissed the state law claims brought against the Board of Trustees. The plaintiff's claims remaining against the Board of Trustees are those brought pursuant to Title IX, Section 504, and the ADA, while those remaining against Dr. Parker in her individual capacity are for negligence and outrage. All other defendants were dismissed.

The court conducted a bench trial beginning on May 20, 1997. After three and one-half days of testimony, at the close of the plaintiff's evidence and after she had rested, the defendants individually made separate motions for judgment as a matter of law pursuant to Rule 52(c) of the Federal Rules of Civil Procedure (the "Federal Rules"). Both motions were granted. These findings of fact and conclusions of law are entered now as required by Rule 52(a) of the Federal Rules.

**II.   Findings of Fact.**

1.   The plaintiff received an undergraduate degree in psychology from the University of South Carolina at Aiken in 1993.

2.   She entered graduate school in Women's Studies at the University of South Carolina at Columbia for the academic year 1993-94.

2

3.     In September 1994, she transferred to the University of Alabama's graduate program in Women's Studies.

4.     She had been previously aware of the University's Women's Studies Department, having read of it in publications and having carried on a correspondence with Dr. Elizabeth Meese, a professor in the English Department of the College of Arts and Sciences who also taught one or more courses in Women's Studies.

5.     Because the plaintiff's two children could not move to Tuscaloosa, Alabama, the plaintiff commuted weekly from her home in North Augusta, South Carolina to the University, staying at a hotel while in Tuscaloosa.

6.     Shortly after the plaintiff enrolled at the University, she began a consensual, intimate relationship with the Women's Studies department chair, defendant Dr. Parker.

7.     Ms. Gray's and Dr. Parker's first consensual intimate encounter occurred on November 10, 1994.

8.     Shortly thereafter, the plaintiff moved into Dr. Parker's home, a house owned jointly by Drs. Parker and Meese, who had then recently ended their own relationship.

9.     Dr. Parker wanted to keep the relationship between herself and Ms. Gray from becoming public because, while University policy did not prohibit such a student-teacher relationship, the University community widely considered it to be unethical and discouraged such conduct.

10.    Ms. Gray, however, told many people, including Dr. Meese, of her relationship with Dr. Parker. The plaintiff's actions upset Dr. Parker and precipitated a conflict between them.

3

11. The plaintiff claims that Dr. Parker required her to leave school at the University.

12. Dr. Parker testified, however, that the plaintiff had misinterpreted her statement and that instead, she meant that Ms. Gray had to move out of Dr. Parker's home.

13. Dr. Carol Pierman, a professor in the Women's Studies Department, was the plaintiff's advisor and graduate director.

14. When Dr. Pierman and other members of the faculty learned of the relationship between Dr. Parker and Ms. Gray, they arranged for the plaintiff to receive temporary grades of "Incomplete" in all her courses, to turn in her papers after their due dates, and for neutral readers to evaluate the papers and assign them grades.

15. Dr. Pierman made particular efforts to eliminate any harm to the plaintiff that the plaintiff's relationship with Dr. Parker might have on the plaintiff's academic experience.

16. Ms. Gray received a grade of "A" in each class for which she was enrolled in the fall 1994 semester.

17. While the response of the Women's Studies department through Dr. Pierman may not have been the best response it could have taken, it was nevertheless appropriate under the circumstances and given its obligations to the plaintiff, the school, and other students enrolled in the department.

18. Ms. Gray withdrew from her course of study sometime after November 11, 1994, and on approximately November 22, 1994, she moved out of Dr. Parker's house and returned to South Carolina.

19. The plaintiff returned to live at Dr. Parker's house on December 15, 1994.

4

20. Ms. Gray enrolled as a graduate student with the Women's Studies department for the spring 1995 semester and withdrew after one day for the sole purpose of receiving financial aid for that semester.

21. She again enrolled as a graduate student with the Women's Studies department for the summer 1995 semester.

22. Having previously formed a thesis committee, Ms. Gray completed her thesis in July 1995, and received her graduate degree.

23. She and Dr. Parker terminated their relationship in May 1995, and the plaintiff again moved out of Dr. Parker's house.

24. In late August 1995, the plaintiff complained to Dr. Henry Lazer, Assistant Dean of the University's College of Arts and Sciences, that Maryann Smith, a secretary in the Women's Studies department, had slanderously accused her of vandalizing a Women's Studies classroom.

25. In the context of Ms. Gray's discussions with Dr. Lazer regarding the alleged slander, she revealed her previous relationship with Dr. Parker and that she believed she had been sexually harassed.

26. Dr. Lazer and Dr. Beverly Thorn investigated the plaintiff's allegations of sexual harassment and found that the Women's Studies department had taken appropriate and effective steps to ameliorate any effect her relationship with Dr. Parker might have had on her academic career and to insure it would not be damaged.

27. Dr. Thorn completed her investigation and concluded that Ms. Gray had not been sexually harassed or subjected to a hostile environment.

5

28. Dr. Parker was removed as department chair as a result of having an improper relationship with one of her students.

29. Therapists at the University's student psychological counseling center, where Ms. Gray sought counseling, opined that the plaintiff suffers from borderline personality disorder that impedes her ability to emotionally handle any romantic relationship.

30. Sometime in 1992, Ms. Gray told people that she and her then partner, Betty Sprouse, were going to have a child.

31. The baby was a "fantasy" child. To carry out the illusion that she was pregnant, the plaintiff wore padded undergarments in order to give the appearance of being pregnant.

32. She gave birth to this fantasy child on November 19, 1992, after pretending that her water had broken while attending one of her classes at the University of South Carolina.

33. She later altered the story of the fantasy baby and told people that she had borne the child as a surrogate mother for one of her relatives.

34. In April 1995, immediately following the bombing of federal building in Oklahoma City, Ms. Gray told Maryann Smith that her child had been killed in that bombing.

35. The next day she told Ms. Smith that the child's mother also had been killed in that same incident. The stories of the baby, its death, and the death of its mother were all false.

36. The plaintiff filed this cause of action on November 30, 1995.

6

## III. Discussion.

### A. Plaintiff's Credibility.

This plaintiff, in the role of witness, was as thoroughly discredited as any witness this court can recall in some thirty years of experience with the trials of lawsuits, as a student, practitioner, United States Magistrate, and now United States District Judge. On the witness stand she was combative, evasive, rebellious, and arrogant, resisting repeated attempts by the court to convince her to simply answer counsel's questions in a direct and straight-forward way. Clearly, she attempted to manipulate the proceedings to her advantage. For example, on each occasion when defense counsel asked her to read a portion of some document, she professed that she was a slow reader and would require an extended time to comply. She then would take several minutes while she professed to read fairly short and simple passages from the document. This came from one who holds a bachelor's degree in psychology and a master's degree in Women's Studies. On other occasions, apparently when it suited her purpose, the plaintiff demonstrated, by doing so, that she was perfectly capable of reading, and of reading well. When defense counsel asked the plaintiff to read aloud from an enlarged copy of her application for an Alabama driver's license, the plaintiff feigned an exaggerated manner, reading phonetically with unintelligible guttural sounds interspersed throughout.

Moreover, on cross-examination, the defendants elicited admissions from the plaintiff, too numerous to detail, that she had been untruthful on earlier occasions. Except where her testimony was corroborated by the testimony of creditable witnesses, the

documentary evidence, or was admitted by the defendants, the court has not credited the plaintiff's testimony.

### B. Title IX Claim.

The plaintiff avers that the University excluded her on the basis of sex from participation in, denied her the benefits of, and subjected her to discrimination under its academic programs. She further contends that the University limited her on the basis of sex in the enjoyment of rights, privileges, advantages, and opportunities at the University and that as a result, she suffered emotional distress and damage to her academic life and career. *Complaint* at 7-8. Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a).

Title VII principles apply when evaluating the damages available to a plaintiff making a claim pursuant to Title IX. *City of Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60 (1992). In order for a plaintiff to prevail under Title IX, she must prove that (1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on sex; (4) the harassment was sufficiently severe or pervasive so as to alter the conditions of her education and create an abusive educational environment; and (5) some basis for institutional liability has been established. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66-73 (1986); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993). The evidence presented at trial by the plaintiff, however, failed to demonstrate that she could make this prima facie showing. She offered no evidence suggesting that she was subject

8

to unwelcome harassment other than her own testimony to which the court assigns no probative value. The overwhelming evidence established that she entered into a consensual intimate relationship with Dr. Parker and never indicated to anyone that the relationship became at any time nonconsensual or coercive.

Assuming that she was harassed, however, she has not presented evidence that such harassment altered the conditions of her education to her detriment or that the University should be liable for the harassment. Ms. Gray knowingly and willingly entered into a consensual relationship with one of her professors. Upon learning of the relationship, the University, acting through other Women's Studies faculty members, immediately took appropriate measures to insure that the plaintiff's academic experience in the Women's Studies department would not be damaged. When the plaintiff complained to University officials outside the Women's Studies department that Maryann Smith was making slanderous accusations against her and the University met with her to discuss the issue, the plaintiff made additional allegations of sexual harassment. The University immediately and effectively undertook an investigation of the matter, determined there was no harassment, and disciplined Dr. Parker for having engaged in an unethical relationship with a student. Ms. Gray received grades of "A" in all of her classes, and she subsequently earned her master's degree. She voluntarily chose to withdraw from school during the 1995 spring semester. The court does not credit her testimony that Dr. Parker "forced" her to withdraw. The record demonstrates that other Women's Studies faculty members stood ready and able to assist her. That they would and could do so was amply demonstrated by their conduct after they learned of the improper relationship during the 1994 fall semester.

9

Furthermore, under this Circuit's law of sexual harassment, "a supervisor's harassing conduct is typically outside the scope of his employment." *Faragher v. City of Boca Raton*, 111 F.3d 1530, 1535 (11th Cir. 1997) (Title VII case). An employer can be held indirectly liable for hostile environment sexual harassment in two instances only: "(1) when a harasser is acting within the scope of his employment in perpetrating the harassment, . . . and (2) when a harasser is acting outside the scope of his employment, but is aided in accomplishing the harassment by the existence of the agency relationship." *Id.* at 1536. This law applies equally to the claims at hand. There is no credible evidence that Dr. Parker harassed the plaintiff while acting within the scope of her employment as a professor or department chair. Neither has Ms. Gray presented evidence that Dr. Parker was aided in accomplishing the claimed harassment by the existence of her agency relationship with the University. The common law of agency does not use "aided" in the sense that a supervisor is aided in accomplishing the hostile environment "because his responsibilities include close proximity to and regular contact with the victim." *Id.* at 1537. Instead, "the employer is liable only if the harassment is accomplished by an instrumentality of the agency or through conduct associated with the agency status." *Id.* There is no credible evidence that Dr. Parker ever threatened Ms. Gray with any adverse consequences if the plaintiff refused to accommodate harassing propositions. Moreover, the plaintiff presented no evidence that anyone in the Women's Studies department made any decisions regarding Ms. Gray's educational experiences based upon her response to any harassing propositions. The conduct of a professor having a consensual relationship with a student cannot reasonably be viewed as conduct associated with the professor's

10

status as an agent of his or her school. The plaintiff has thus failed to proffer evidence establishing the five elements of her Title IX claim, and the claim will be dismissed.

### C.   Section 504 and ADA Claims.

The plaintiff avers that she suffers from depression and other emotional illnesses that substantially limit her ability to learn and work. She contends that, on the basis of this disability, the University excluded her from the participation in, denied her the benefits of, and subjected her to discrimination under its academic programs. *Complaint* at 8-9. The Rehabilitation Act provides:

> No otherwise qualified individual with a disability in the United States, as defined in section 706(8) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

29 U.S.C. § 794(a). The Act defines an "individual with a disability" as "any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." § 706(8)(B).

Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. It defines "qualified individual with a disability" as

> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

11

§ 12131(2).

There is very little precedent in this Circuit explaining or elaborating on the provisions of the ADA. However, it is generally conceded that cases decided under the Rehabilitation Act provide helpful insight to review of claims arising under the ADA. *See, e.g., Milton v. Bob Maddox Chrysler Plymouth, Inc.*, 868 F. Supp. 320 (S. D. Ga. 1994); *Sawinski v. Bill Currie Ford, Inc.*, 866 F. Supp. 1383 (M. D. Fla. 1994); *see also*, Interpretive Guidance on Title I of the Americans with Disabilities Act, 29 C.F.R. § 1630.2(g) and (m) (App.) (noting congressional intent to rely on cases interpreting the Rehabilitation Act in reviewing ADA claims). To establish a prima facie case of discrimination under both the Rehabilitation Act and the ADA, the plaintiff must establish that she (1) is a qualified individual; (2) who has a disability or handicap; and (3) is suffering discrimination by reason of such disability. 42 U.S.C. § 12132 (ADA); *see Jackson v. Veterans Admin.*, 22 F.3d 277, 278 (11th Cir.), *cert. dismissed*, 513 U.S. 1052 (1994) (Rehabilitation Act).

A person has a "disability" if that person has (1) a physical or mental impairment that substantially limits one or more of the major life activities; (2) a record of such an impairment; or (3) is regarded as having such an impairment. 42 U.S.C. § 12102(2). "'[M]ajor life activities' are those basic activities that the average person in the general population can perform with little or no difficulty." 29 C.F.R. § 1630.2(i) (App.). They include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id.*

Ms. Gray presented evidence at trial that she suffers from borderline personality disorder but did not prove that this mental condition substantially limits one or more of her

12

major life activities. Thus, she did not prove that she is disabled as that term is defined under either of the involved statutes. Even if the court were to assume that she qualifies as a person with a disability under the ADA and the Rehabilitation Act, however, the plaintiff has not proved that the University did not make reasonable accommodations for her disability. The ADA requires that an employer, or in this case, an educational institution, make reasonable accommodations "to the known physical or mental limitations" of an employee, or here, a student. *See* 42 U.S.C. § 12112(b)(5)(A); *Morisky v. Broward County*, 80 F.3d 445, 448-49 (11th Cir. 1996) (holding that employer was not liable under ADA because there was no evidence that employer knew plaintiff's illiteracy was due to impairment and not to lack of education). Failure to accommodate the known physical limitations of an employee constitutes discrimination under the ADA. 42 U.S.C. § 12112(b)(5)(A). Since Ms. Gray failed to offer evidence that the University discriminated against her by making such an omission, she has no claim pursuant to either the Rehabilitation Act or the ADA, and these claims will be dismissed.

### D.   Negligence Claim.

Ms. Gray contends that Dr. Parker acted negligently toward her by failing to provide an academic environment free from "faculty-inflicted harassment and discrimination." *Complaint* at 10-11. In order to establish that Dr. Parker acted negligently, the plaintiff must prove that (1) Dr. Parker owed her a duty of care; (2) Dr. Parker breached that duty; and (3) the plaintiff suffered damages as a proximate result of such breach. *Liberty Nat'l Life Ins. Co. v. Weldon*, 100 So. 2d 696, 707 (Ala. 1957).

The plaintiff failed to establish at trial that Dr. Parker owed her any duty whatsoever. She brought claims against Dr. Parker in her individual capacity and not in her capacity as a University faculty member or former chair of the Women's Studies department. Persons engaged in an intimate relationship of a sexual nature owe no duty of care to one another with regard to that relationship. The evidence presented at trial demonstrates that the relationship between Dr. Parker and Ms. Gray was consensual in nature. Therefore, no duty was owed by either woman to the other, and the plaintiff's negligence claim will be dismissed.

**E.    Outrage Claim.**

The plaintiff avers that the emotional harm she suffered as a result of Dr. Parker's conduct was intentional or reckless and that Dr. Parker's acts were so outrageous "as to go beyond all possible bounds of decency." *Complaint* at 11-12. One who acts extremely and outrageously such that he intentionally or recklessly causes severe emotional distress to another is liable under the tort of outrage. *American Road Serv. Co. v. Inmon*, 394 So. 2d 361, 365 (Ala. 1980). Extreme conduct is that which is "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Id.* "The emotional distress thereunder must be so severe that no reasonable person could be expected to endure it." *Id.*

The tort of outrage "is a very limited cause of action that is available only in the most egregious circumstances." *Thomas v. BSE Indus. Contractors, Inc.*, 624 So. 2d 1041, 1044 (Ala. 1993). The Alabama Supreme Court has noted that in only three categories has it

14

found that a jury question exists on an outrage claim: (1) cases concerning wrongful conduct in the context of family burials; (2) cases in which insurance agents used abhorrent methods of coercing an insured into settling a claim; and (3) cases involving egregious sexual harassment. *Id.*

The facts of this case do not fall into one of these three previously recognized categories, nor do they even remotely suggest that Dr. Parker acted in such an extreme and outrageous manner as to violate the bounds of common decency. Accordingly, the outrage claim will be dismissed.

### IV. **Conclusion.**

The plaintiff's credible evidence at trial was insufficient to prove any of her claims; therefore, the court will grant the defendants' motions for judgment as a matter of law, and all of the claims will be dismissed. The court will enter an appropriate order in conformity with this memorandum of opinion.

Done, this __12th__ of June, 1997.

EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE